Edward J. Miller v. Commissioner.
Miller v. Commissioner
Docket No. 3300.
United States Tax Court
1944 Tax Ct. Memo LEXIS 328; 3 T.C.M. (CCH) 238; T.C.M. (RIA) 44083; March 18, 1944
*328 Robert Ash, Esq., and A. J. Nauman, C.P.A., Munsey Bldg., Washington, D.C., for the petitioner. Cecil H. Haas, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent determined income tax deficiencies for the calendar years 1940 and 1941 of $4,281.29 and $7,714.78, respectively. Some of the adjustments are not in controversy here. The first issue is whether petitioner is taxable upon certain amounts which were credited in the taxable years to petitioner's wife and daughter as their distributive shares of the net income of an alleged family partnership. The second issue is whether petitioner is entitled to a bad debt deduction under section 23 (k) of the Internal Revenue Code. Petitioner resides in Louisville, Kentucky, and filed his returns for the taxable years with the collector for the district of Kentucky. Findings of Fact Petitioner has been engaged in the insurance business for the past 45 years commencing as a clerk in 1899. In April 1913, he started his own agency in Louisville, Kentucky, and since that time he has written all types of insurance. Prior to the taxable years, the agency was conducted under the name of "Edw. J. *329 Miller & Co." and represented approximately 15 insurance companies. The agency was one of the four largest in Louisville and had been built up through the personal efforts of petitioner. During the early years of the agency, petitioner had bought out several other agencies in Louisville. The agency had 8 office employees, 1 outside collector, and about 19 salesmen. Two of the salesmen were on a salary and commission basis, and the remainder were on a straight commission basis. Their compensation from the agency was the commission usually paid to insurance brokers by the insurance companies for the production of business and ranged from 7 1/2 percent to 20 percent of the policy premiums. The business brought in by the salesmen was not particularly lucrative to the agency. The major part of the agency's profits was derived from the business written by petitioner and his son. About two-thirds of the total amount of the business written by the agency was produced by petitioner and his son, and the remainder was produced by the salesmen. In the event the salesmen left the employ of the agency, they had the sole and exclusive right to solicit their customers for the renewal of the policies. *330 The agency received about 2 percent of the premiums on the business brought in by the salesmen and on some classes of this business the agency lost money. The renewal of policies and good-will represent the chief value of an insurance agency. About 75 percent of the agency's business was renewal business, and about 25 percent was new business. On some of the business written by the agency, the insured executed notes for the premiums or paid the premiums under a deferred payment plan. The agency usually borrowed 80 percent of the face value of the notes from banks, and the collateral for the loans by the agency were the notes of the insured and corporate stocks owned personally by petitioner. The amount of the notes payable was $23,693.37 as of December 31, 1940, and $19,304.55 as of December 31, 1941. As of December 31, 1940, and December 31, 1941, the notes receivable were in the respective amounts of $20,942.52 and $17,750.00. On the same dates the accounts payable to the insurance companies for policy premiums were $70,597.29 and $58,864.68, respectively. Petitioner has two children: a son, Lincoln Miller, age 32, and a daughter, Marjorie Miller Wyatt, age 30. Upon leaving preparatory *331 school, Lincoln Miller went into his father's business and has continuously worked in the business since that time. Petitioner's daughter, Marjorie, graduated from Wellesley College and returned to Louisville. After taking a short business course, she commenced to work in the agency in 1936. On December 30, 1936, petitioner entered into an agreement with his son and daughter whereby they each were to receive 15 percent of the net profits of the business as consideration for their services to the agency. Amounts representing 15 percent of the net profits of the business were thereafter credited to their accounts on the company's books but were never actually paid. Marjorie left the agency in 1939 to go to New York to engage in other work. On June 25, 1940, a partnership agreement was entered into between petitioner, his wife, Caroline W. Miller, and petitioner's two children, Lincoln and Marjorie. The agreement recited that petitioner, "operating the business formerly known as Edw. J. Miller & Company as an individual ownership * * * does by these presents for a valuable consideration give, transfer and convey unto second parties interests in said business in the following proportions, *332 viz.: Caroline W. Miller, a 35% interest; Lincoln Miller, a 15% interest., Marjorie E. Miller, a 15% interest and has retained unto himself a 35% interest in said business". The parties agreed to become partners and to share in the profits and losses in proportion to the respective interests they held in the partnership. It was agreed that the management and control of the partnership was to be vested solely in petitioner and Lincoln Miller. Neither petitioner's wife nor his daughter was to have any power to make contracts of insurance without the special consent of petitioner or Lincoln Miller. The name of the agency was changed to "Edw. J. Miller & Son". No entries were made on the agency's books showing the interests of the parties in the agency's assets and the books do not reflect any capital account of the parties. Petitioner filed a gift tax return on March 15, 1941. The gift tax was paid by the donees by a charge against their distributive shares of the profits of the business. Petitioner received a yearly salary of $9,000 from the agency and his son Lincoln Miller received a yearly salary of $6,000. After the partnership agreement was executed, new contracts were made with *333 the 15 companies represented by the agency. An affidavit was filed with the county clerk, indicating the creation of the new partnership. During the taxable years, petitioner, his wife, and his son and daughter were all licensed as insurance agents by the State of Kentucky. Under regulations of the State of Kentucky, an insurance license is obtained by filing an application with the state insurance department, and after investigation, a license is issued. During the taxable years, petitioner's wife and daughter had the power to sign agency checks, although no such checks were actually signed by them. During these years, notes for loans made by banks to the agency were signed by petitioner personally, and were secured in part by collateral in the nature of corporate stock owned personally by him. Interest on the notes was paid by the agency. During the taxable years, the agency did not have substantial assets. During the year 1940, the agency owned an automobile valued at $853 and furniture and fixtures valued at $7,806. The major part of the accounts receivable were owed to the insurance companies. Although there were several parcels of real estate carried on the agency's books, *334 they were all owned personally by petitioner. In 1941, the agency bought a new automobile and the agency's automobiles were valued at $2,127. Furniture and fixtures were valued at $9,189. The only other asset as reflected by the agency's books was a debt owing by petitioner personally to the agency in the sum of $4,822.84. On June 25, 1940, a closing entry was made in the profit and loss account of Edw. J. Miller & Co. The profits from that date until the end of the year were $20,213.80 which were credited to petitioner. On December 31, 1940, charges were made against petitioner's account to the credit of Caroline W. Miller, Marjorie Miller Wyatt, and Lincoln Miller in the respective amounts of $7,074.83, $3,032.07, and $3,032.07. The profit and loss account for 1941 showed a total profit of $23,894.26. By entries dated December 31, 1941, credits were made to Caroline W. Miller in the sum of $8,362.98 and to Marjorie Wyatt in the sum of $3,584.15. During 1940, petitioner paid all the expenses of maintaining a home for himself and his wife. He also paid the personal expenses incurred by his wife. In this year, the wife withdrew from the business $13.75. For the year 1941, the wife *335 withdrew $600 per month from the business which was used in part to pay all household and personal expenses except the taxes and repairs on the home, title to which was in petitioner's name. In addition to the $600 monthly withdrawal, certain other expenses incurred by the wife were paid by the agency and charged to her account. During 1940, Marjorie Miller Wyatt withdrew $14.87 from the business. In 1941, she withdrew $9,455.76. Of this amount $560.80 was used to pay her proportionate share of the gift tax incurred by petitioner in connection with the gifts of interests in the business and $7,500 was uesd to purchase stock of the Kenyon Investment Company, a family corporation organized by petitioner to hold a lease on the Keyon building in Louisville. During the taxable years, petitioner's wife, Caroline W. Miller, rendered no services in behalf of the agency. In 1939, she had loaned petitioner $7,000 which she had received from her mother's estate. Of this amount, $5,750 was put into the agency by petitioner. Petitioner's daughter, Marjorie Wyatt, worked in the agency's office for five weeks during the summer of 1940. She was married in the autumn of 1940 and resided thereafter *336 in Summit, New Jersey. She did not work for the agency in 1941, except that she contacted the offices of the insurance companies in New York and Connecticut on rare occasions. During the taxable years, the agency wrote several small policies which were produced by her. Capital was not a material factor in producing the income of the partnership. Petitioner's wife and daughter made no capital contribution and rendered no substantial services in the production of the partnership's income. They were not bona fide partners during the taxable years. In 1940, the Phoenix Motor Freight, Inc. was in poor financial condition. Zettel, the president of the company, came to petitioner for insurance. Petitioner agreed to loan $5,000 to the company in consideration of securing all of the company's insurance. Zettel, in conjunction with another, owned 87 shares of the company's $100 per value stock. The company had 155 shares of outstanding stock. Petitioner was to be repaid the $5,000 and in addition was to receive one-third of any dividends that might be paid on the 87 shares of stock. In December 1940, petitioner gave his check for $5,000 to Zettel who deposited it to the account of the company. *337 Petitioner did not receive any stock in the company but in June or July of 1941, Zettel deposited with petitioner the 87 shares of stock as collateral for the loan. The $5,000 advanced by petitioner to the company in 1940 was a laon and not a purchase of stock. The debt became worthless in 1941 when the company went into bankruptcy. Opinion The first question presented is whether petitioner is taxable upon his wife's distributive share and his daughter's distributive share of the net income of Edw. J. Miller & Son, which purports to be a family partnership engaged in the business of selling insurance. Petitioner contends that his wife and daughter were bona fide partners during the taxable years by virtue of their contributions to the capital of the partnership. He asserts that the interests in the business which he gave them under the partnership agreement were capital contributions which must be recognized for tax purposes. He maintains that capital was an important factor in producing the income of the business. Respondent contended at the hearing that the profits of the insurance agency were derived primarily from the personal efforts of petitioner and his son, Lincoln. It *338 was for this reason that he recognized Lincoln as a bona fide member of the partnership. We understand his contention to be that capital was not important in producing the partnership income, and that since petitioner's wife and daughter contributed no substantial services during the taxable years, they cannot be considered bona fide partners. There would seem to be little doubt that the selling of insurance is in large measure a personal service business. Company rates are usually standardized and a person interested in procuring insurance could as well obtain it from one agency as another. Personal acquaintance and confidence in the agent or broker are the important factors in securing and holding business. Constant personal attention is necessary to retain the business but in the usual case policies of insurance are renewed by the insured. We think the record is abundantly clear that the business of the Miller agency was built up through the years by the ability and personal efforts of petitioner. During the taxable years, about one-third of the agency's business was procured through salesmen but the profits derived by the agency from this business were not large. The substantial *339 profits of the agency were earned by petitioner and his son. During the taxable years, petitioner's wife rendered no services to the agency and procured none of its business. During these years, the daughter worked in the agency for only five weeks, and during this time produced only a few items of insurance. Certainly, it cannot be said that her efforts warranted an annual distribution of 15 percent of the agency's profits. Petitioner's claim that capital was a material factor in producing the agency's income is without foundation. It is true that some of the policy premiums were paid by notes to the agency, and the agency in turn borrowed 80 per cent of the value of the notes from the local banks. As of December 31, 1940, and December 31, 1941, the notes receivable by the agency amounted to $20,942.52 and $17,750, respectively. However, when it is considered that the agency earned over $100,000 each year in commissions, it must be assumed that the annual premiums collected by the agency amounted to well over $500,000. It is therefore apparent that the amount of business written on credit was small. It should also be noted that the agency notes to the banks were signed by petitioner *340 and were secured by his personal corporate stocks. It was petitioner's capital and not the agency's capital which was instrumental in securing credit at the bank. As a matter of fact, the agency's records indicated that its capital assets were negligible. Aside from its accounts receivable which were for the most part due and owing to the insurance companies, the agency had only 2 automobiles and office furniture and fixtures. The books of the agency do not show the interests transferred to the wife and daughter, nor any capital accounts in their names. During the year 1940, there were no substantial withdrawals by them from their distributive shares. In that year, petitioner paid all the household expenses for himself and his wife. In 1941, the wife withdrew substantial amounts from the business which she used in large part to pay household expenses and personal expenses which in prior years had been paid for by petitioner. The major part of the daughter's withdrawals in that year was used to pay the gift tax incurred by petitioner and for the purchase of treasury stock in a family corporation, known as the Kenyon Investment Company, which was organized and controlled by petitioner. *341 The money received by the Kenyon Investment Company was used to pay its obligations in connection with a lease which it had taken on the Kenyon Building in Louisville. This venture was originally inaugurated and assumed by petitioner personally. We think the facts warrant the conclusion that the transfer by petitioner of interests in his agency was not for any business purpose but merely to reallocate the substantial profits of the agency to the other members of his family unit. The facts of this proceeding are essentially similar to those in Earp v. Jones, 131 Fed. (2d) 292, certiorari denied, 318 U.S. 764; and in Mead v. Commissioner, 131 Fed. (2d) 323, certiorari denied, 318 U.S. 777. Those cases involved transfers by husband to their wives of interests in insurance agencies which had been previously owned by the husbands. Subsequently, a partnership was formed between husband and wife. It was held in those cases that the wives' distributive shares of the net income of the partnerships were taxable to the husbands. See also, Schroder v. Commissioner, 134 Fed. (2d) 346; *342 Tinkoff v. Commissioner, 120 Fed. (2d) 564; Francis Doll, 2 T.C. 276; and Francis E. Tower, 3 T.C. 396. Under the circumstances, it is held that petitioner's wife and daughter were not bona fide members of the partnership and that petitioner is taxable upon their distributive shares of the net income of the partnership for the taxable years. The second question is whether petitioner is entitled to a bad debt deduction of $5,000 under section 23 (k) of the Internal Revenue Code. Respondent admits that a loss was incurred by petitioner in the taxable year 1941. It is his contention, however, that the loss was a short term capital loss on the theory that petitioner purchased stock of Phoenix Motor Freight, Inc., in 1940. We think the record is conclusive that petitioner did not purchase stock of the company but made a loan of $5,000 to the company. He so testified, as did another witness who was present at the time of the transaction. No stock of the company was ever transferred to petitioner and the only stock that was ever in his possession was held as collateral security for the loan. *343 Under the circumstances, it must be held that since the debt became worthless in 1941, petitioner is entitled to a bad debt deduction in that year. Accordingly, Decision will be entered under Rule 50.