H. G. Whittenberg, Sr. v. Commissioner.
Whittenberg v. Commissioner
Docket No. 2778.
United States Tax Court
1944 Tax Ct. Memo LEXIS 122; 3 T.C.M. (CCH) 941; T.C.M. (RIA) 44293; September 13, 1944
*122 Donald V. Hunter, Esq., 920 Southern Bldg., Washington, D.C., for the petitioner John H. Pigg, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent determined a deficiency in income tax for the year 1941 in the amount of $72,682.02. Some of the adjustments made by the respondent are not contested. The issues are whether respondent erred in: (1) Disallowing a deduction from the partnership income of $3,600 for entertainment expenses; (2) Treating as ordinary income of the partnership, rather than as a capital gain, the sum of $6,466.26 realized in the taxable year from the sale of certain equipment to the Government; and (3) Taxing to petitioner, as his distributive share of income from a partnership, the sum of $105,968.44, which had been credited on the partnership books as the distributive share of petitioner's three minor children. Petitioner is a resident of Louisville, Kentucky, and filed his individual income tax return for the taxable year with the collector for the district of Kentucky. Issue I Findings of Fact: During the taxable year petitioner carried on a business under the name of Whittenberg Construction Company. *123 His brother-in-law, William M. Irion, was a partner in the business. In addition to amounts paid as salaries to petitioner and Iron, total sums were paid to them, respectively, in the amounts of $2,400 and $1,200, which, it is alleged, were to reimburse them for expenditures for entertainment and travel in the conduct of the business. No itemized records were kept by petitioner or Irion of their disbursements for such purposes. Respondent disallowed deduction from partnership income of $3,600 which was taken in the partnership return as business expense. OPINION: No evidence was offered to show that petitioner and Irion expended sums for travel and entertainment expense in the conduct of the business, other than petitioner's testimony that he and Iron were reimbursed out of the partnership income for disbursements for such purposes. There is no evidence relating to any particular disbursement or to any particular travel or entertainment. Petitioner now admits his inability to prove the alleged expenditures but contends that the deduction should be allowed because it had been customary for the business to reimburse petitioner and Irion "for personal expenditures for entertainment *124 in connection with the business of the partnership". In support of the broad contention, Alexandria Gravel Co., Inc. v. Commissioner, 95 Fed. (2d) 615, is cited. That case is not in point. The facts in that case differ greatly from the meager facts here. There is no evidence on the matter at issue. Petitioner and Irion did not even offer testimony about any of their expenditures for travel and entertainment. All that petitioner had to say was that he had always withdrawn sums from the business above the amount of his salary "for personal expenditures for entertainment and for travel * * * necessary for * * * operation of the business". Personal expenses are not deductible. Expenditures which are alleged to be ordinary and necessary business expenses must be proved to be such by the taxpayer, where, as here, he has the burden of proof. Petitioner has failed to meet the burden of proof. For lack of evidence, we sustain respondent's disallowance of a deduction from partnership income for $3,600, in his determination of petitioner's distributive share of the net income of the business. Issue II Findings of Fact: In 1940, the Whittenberg Construction *125 Company entered into a contract with the Federal Government for construction work at Fort Knox. Kentucky. The Fort Knox contract was a fixed fee contract with the War Department, under which any equipment owned by the contractor was furnished for the use of the contract at a rent agreed upon at the start of the job. An appraisal of the value of the equipment to be used was made by the Government, and when the accumulation of rent equalled an agreed percentage of the appraised value, title to the equipment passed to the Government, which was obligated, however, to make further payments up the full appraised value in the form of rentals, plus a fee of 1 percent of the appraised value per month. In other words, the Government was entitled to "recapture" certain of the equipment whenever rentals paid by it in respect of the equipment had reached a certain amount which exceeded the actual cost of the equipment to the Construction Company. In the taxable year, the Government "recaptured" the following equipment pursuant to the contract, and the Construction Company realized a net profit: Amount to
Date
Book
Date of
Be Paid On
Equipment
Acquired
Cost
Recapture
Recapture
# 39 1/2 ton Chev. pick-up
9/30/40
$ 570.79
12/16/41
$ 590.00
# 58 1 1/2 ton Chev. dump truck
10/29/40
750.00
12/16/41
1,200.00
# 59 1 1/2 ton Intl. dump truck
2/26/39
1,778.58
11/24/41
1,200.00
# 60 1 1/2 ton Intl. dump truck
2/28/39
1,778.59
12/16/41
1,200.00
# 61 1 1/2 ton Intl. dump truck
5/24/39
1,001.50
11/24/41
1,200.00
# 77 1 1/2 ton Ford dump truck
10/16/40
906.61
10/17/41
1,200.00
#133 10B Crane with boom
11/ 3/39
3,555.00
12/11/41
4,000.00
#101 Whirler and boom
1/31/39
4,765.60
5,000.00
#261 Ripsaw
1/ 1/36
300.00
400.00
Totals
$15,406.67
$15,990.00
*126 Since the rental payments made in 1941 did not equal the appraised values required to be paid on recapture, the respondent determined the profits on recapture for 1941 by first determining the total profits which would result from recapture and payment of the total appraised value, and allocating to 1941 the percentage of the total profit which the payments made in that year were to the total payments required to be made on recapture of the equipment. To this was added the fee of 1 percent per month received in 1941 in connection with the recapture. The gains in this connection, after taking into account depreciation allowed to December 31, 1940, were as follows: Depre-
Total 1941
ciation
Adjusted
Rental
Profit Inc.
Allowed to
Basis *
Payments
1% Fee
12-31-40
1-1-41
for 1941
per Month
# 39 1/2 ton Chev. pick-up
$ 47.57
$ 523.22
$ 488.00
$ 131.93
# 58 1 1/2 ton Chev. dump truck
31.25
718.75
1,020.00
565.06
# 59 1 1/2 ton Intl. dump truck
815.17
963.41
1,020.00
345.10
# 60 1 1/2 ton Intl. dump truck
815.18
963.41
1,020.00
357.10
# 61 1 1/2 ton Intl. dump truck
396.43
605.07
1,020.00
649.69
# 77 1 1/2 ton Ford dump truck
56.66
849.95
1,035.00
433.92
#133 10B Crane with boom
1,036.87
2,518.13
3,755.00
1,871.10
#101 Whirler and boom
2,283.52
2,482.08
3,839.43
1,933.48
#261 Ripsaw
291.00
9.00
183.00
178.88
Totals
$5,773.65
$9,633.02
$13,380.43
$6,466.26
*127 Schedule A sets forth fully the cost, the payments made, and other pertinent facts: Schedule A
(1)
(2)
(3)
(4)
(5)
Depreciation
Adjusted
Appraised
Book
Allowed to
Basis
Value per
Cost
12-31-40
1-1-41
Contract
Profit
# 39 39 1/2 ton Chev. pick-up
$ 570.79
$ 47.57
$ 523.22
$ 590.00
$ 66.78
# 58 1 1/2 ton Chev. dump truck
750.00
31.25
718.75
1,200.00
481.25
# 59 1 1/2 ton Intl. dump truck
1,778.58
815.17
963.41
1,200.00
236.59
# 60 1 1/2 ton Intl. dump truck
1,778.59
815.18
963.42
1,200.00
236.59
# 61 1 1/2 ton Intl. dump truck
1,001.50
396.43
605.07
1,200.00
594.93
# 77 1 1/2 ton Ford dump truck
906.61
56.66
849.95
1,200.00
350.05
#133 10B Crane with boom
3,555.00
1,036.87
2,518.13
4,000.00
1,481.87
#101 Whirler and boom
4,765.60
2,283.52
2,482.08
5,000.00
2,517.92
#261 Ripsaw
300.00
291.00
9.00
400.00
391.00
Totals
$15,406.67
$5,773.65
$9,633.02
$15,990.00
$6,356.98
(6)
(7)
(8)
(9)
(10)
% of
Profit-%
Fee of 1%
Profit to
of Profit
per Month
Total
Appraised
Payments
on 1941
rec'd on sale
Profit
Value
due 1941
Payments
in 1941
1941
# 39
11.3186 $ 488.00
55.23
$ 76.70
$ 131.93
# 58
40.1041 1,020.00
409.06
156.00
565.06
# 59
19.7158 1,020.00
201.10
144.00
345.10
# 60
19.7158 1,020.00
201.10
156.00
357.10
# 61
49.5775 1,020.00
505.69
144.00
649.69
# 77
29.1708 1,035.00
301.92
132.00
433.92
#133
37.04667
3,755.00
1,391.10
480.00
1,871.10
#101
50.3584 3,839.43
1,933.48
1,933.48
#261
97.75   183.00
178.88
178.88
Totals
$13,380.43
$1,288.70
$6,466.26
*128 Column 1: Items appearing in column 1 represent cost of the particular item of equipment referred to. Column 2: Represents the amounts of depreciation allowed by respondent in respect of the various items of equipment from date of acquisition to December 31, 1940. Column 3: Represents cost of various items of equipment, less depreciation allowed to January 1, 1941 (total figure in column 3 represents excess of total figure in column 1 over total figure in column 2). Column 4: Represents appraised value or price at which Government had right to recapture various items of equipment, if recaptured. Column 5: Represents profit on various items of equipment that would have been realized by Whittenberg Construction Company if equipment is taken over or recaptured by Government in 1941. Column 6: Represents percentage of profit (column 5) to appraised value (column 4). Column 7: Represents amounts payable and paid by Government to Whittenberg Construction Company in 1941 as rental payments. Column 8: Represents amount of profit realized in 1941 on partial payments made in 1941, as shown in column 7, by applying to the amounts shown in column *129 7 the percentages appearing in column 6. Column 9: Represents additional fees or sums payable and paid by Government under terms of contract upon recapture of the equipment in 1941, based on period of utilization or period of use. Column 10: Represents total of columns 8 and 9. In the partnership return, short-term capital gains in the amount of $1,731.20 were reported in respect of items #39, 58, and 77. Long-term capital gains in the amount of $2,900.46 were reported in respect of items #59, 60, 61, and 133. Respondent determined that the gain realized from the sale of the equipment in the amount of $6,466.26 was ordinary income and not capital gain under section 117 (a) (1) of the Internal Revenue Code. Accordingly, respondent eliminated the short-term capital gain of $1,731.20 and the long-term capital gain of $2,900.46, as computed on the partnership return. OPINION: The question is whether the equipment in question was a capital asset or a non-capital asset within the definition set forth in section 117 (a) (1) of the Internal Revenue Code. [1] In the partnership return for the Construction Company, the transaction as it worked out in the taxable year was treated *130 as involving the sale of capital assets and 50 percent of the gain was included in taxable income. In determining the deficiency, the respondent added to income the other 50 percent of the gain realized. Petitioner admits that at the time the contract was made with the Government, the equipment in question was used in the business of the Construction Company and was of a character which is subject to the allowance for depreciation provided in section 23 (1); but petitioner argues that after the contract was made, "the equipment *131 became earmarked for a special project and was subject to recapture in the course of the completion of the project. Its status thereafter was not that of an asset used in the Construction Company's trade or business, so as to be subject to an allowance for depreciation under section 23 (1)." We do not agree with the above argument of the petitioner. Under the contract, title to the equipment did not pass until rental payments reached a certain percentage of the appraised value. Until title passed, the Construction Company owned the equipment, and was using it in its business. We think there is not any doubt that the equipment was used in the business of the Construction Company at the time of the sale, and that it was of a character which is subject to the allowance for depreciation. See Regulations 103, sec. 19.117-1, p. 346. It is held that there was no error in respondent's determination that the gain from the sale of the equipment was not capital gain. Respondent's determination is sustained. It is pointed out that there is no question presented relating to the adjusted basis of the equipment for determining the gain realized. See I.T. 3533, C.B. 1942-1, p. 87. Issue *132 III Findings of Fact: From 1927 to 1939, petitioner conducted a general contracting business as a sole proprietorship, under the name Whittenberg Construction Company in Louisville, Kentucky. On January 3, 1939, he formed a partnership with an employee, William M. Irion. After 1938 the business consisted chiefly of construction work under contracts with the United States Government. During the taxable year 1941, all of the business consisted of work under contracts with the United States Government. Petitioner was married in 1927 to his present wife, Kathleen E. Whittenberg. They have three children, H. Gilbert Whittenberg, Jr., born in 1929; William T. Whittenberg, born in 1935; and Walton D. Whittenberg, born in 1940. In 1941 the children were 12 years, 6 years, and 1 year old, respectively. Kathleen E. Whittenberg is a housewife and she has not had any business experience. She was 19 years old when she was married, and since then she has devoted all of her time to her family. In the partnership agreement between petitioner and Irion, dated January 3, 1939, it is provided that the proportion of ownership of petitioner is a two-thirds interest; that the ownership of Irion is *133 a one-third interest, and that the parties would share in the profits and losses in that proportion. Irion contributed $10,000 to the business. Petitioner contributed all of the fixed assets of the business, including machinery and equipment, and liquid assets in an amount which is not stated definitely, but his contribution was presumably about $20,000. The agreement provided that if the partnership should be dissolved, all of the equipment and fixed assets "shall be and is appraised at the sum of $30,000. It is understood that said amount is a fixed sum for all such assets as may be on hand at the termination of this contract * * *." The provisions relating to dissolution were, in general, that if Irion wished to purchase the interest of petitioner, upon dissolution, he would pay him $20,000; and if petitioner wished to purchase Irion's interest, he would pay Irion $10,000. However, in no event would title pass to either party until all contracts on hand had been terminated and the cash and accounts receivable had been divided in proportion to the respective interests. The partnership agreement provided, in particular, that. "It is hereby agreed and understood that the said amount *134 fixed by the parties hereto as the value of the equipment and all assets, including said piece of real estate, is fixed and determined at $30,000, even though the inventory of said equipment at the time of determination shall be in excess of that amount or even though it should be less than that amount. It is fixed in order that no appraisement would be necessary and in order that no sale would be required." The partnership agreement refers to a piece of real estate located at 2204 Floyd Street, Louisville, which petitioner agreed to contribute to the partnership. Upon this property were located an office and a warehouse building used in the business. Petitioner owned this property, and presumably held the title to it in his name. Petitioner did not make any conveyance of this property in 1939, or thereabouts, to the partnership. But on January 4, 1943, he and his wife executed a deed conveying the real estate to a partnership said to be composed of petitioner, Irion, and Kathleen Whittenberg, trustee, and referred to as the Whittenberg Construction Company, to which alleged partnership reference is made hereinafter. The main office of the Construction Company is located on the above *135 property. In the 1939 partnership agreement it was provided that petitioner and Irion would devote their entire time and efforts to the business of the partnership. Also, that each party should be entitled to receive a salary, but that the salaries need not be equal. In 1940, petitioner decided that he wanted "to make my three boys beneficiary of the portion of the earnings of the company," and, accordingly, he undertook to assign one-half of his interest in the business of the Construction Company to his wife, as trustee for each minor child, and to make his three minor children members of the partnership. The children were approximately 11 months, 5 years, and 11 years of age, when petitioner formulated his plan. The plan was to transfer to the wife, as trustee, three one-ninth interests in the Whittenberg Construction Company, to be held in trust for each child for as long as either petitioner or his wife should be alive, or, if both petitioner and his wife should have died when a beneficiary attained the age of 30 years, then the trust would terminate. Part of the plan, also, was to execute a new partnership agreement between petitioner, Irion, and Kathleen Whittenberg, as trustee *136 for each of the three infants, it being the purpose to include as partners with petitioner and Irion, the said three minor sons of petitioner. In pursuance of the above plan, petitioner executed three separate declarations of trust and a new partnership agreement, practically simultaneously, on January 3, 1941. These documents are incorporated herein by reference. The new partnership agreement was executed by petitioner, his wife, and Irion. The terms of the trusts are identical except for the beneficiaries. Under each trust indenture petitioner transferred to his wife, as trustee for the beneficiary, a one-ninth "partnership interest in the Whittenberg Construction Company * * * in accordance with the terms of a partnership agreement dated January 3, 1941 * * *." The trusts are irrevocable, and can not be modified or amended. The trustee is authorized to manage the trust estate, and is given the usual general powers of trustee. The entire net income of the trust estate shall become part of the trust estate and shall be reinvested until the beneficiary reaches 18 years of age, when the trustee may, in her discretion, pay over income to the beneficiary. Also, the trustee, in her *137 discretion, may pay from the trust estate any sum deemed necessary for meeting an emergency affecting the beneficiary. The trusts are to remain in existence for as long as either petitioner or his wife is alive. It is to terminate when both petitioner and his wife are dead. Upon termination of the trusts, if the beneficiary is 30 years old, the property in trust then goes to the beneficiary. If both petitioner and his wife die before the beneficiary reaches 30 years of age, provision is made for partial distribution and for holding the balance in trust until the beneficiary attains 30 years of age. If the beneficiary dies before the expiration of the trust, his interest is to pass to his surviving brothers in equal shares. The new partnership agreement recited that petitioner and Irion owned the Whittenberg Construction Company; that it was the purpose of the new agreement to include the children of petitioner as partners in the business; that Kathleen Whittenberg was to hold the interests of the children in the business in trust, and that petitioner desired to give his three children one-half of his interest in the business in equal shares. The agreement provided that petitioner, *138 Irion, and petitioners' wife formed a partnership under the name Whittenberg Construction Company, the wife declaring herself to be trustee for each child pursuant to the trusts. It was provided that all of the assets of the former partnership became the assets of the new partnership. It was provided that in consideration for his affection for his children, petitioner transferred to each of them, to be held in trust. one-half of his two-thirds interest in the business, so that the interests in the partnership would be Irion, one-third; petitioner, one-third; Kathleen Whittenberg, one-ninth as trustee for H. G. Whittenberg, Jr.., one-ninth as trustee for William T.; and one-ninth as trustee for Walton D., the profits and losses to be shared in that proportion. The agreement provided that Irion and petitioner should devote their entire time to the business and that petitioner's wife should cooperate and perform such services for the partnership as might be reasonably requested of her; that Irion, the petitioner, and Kathleen, as trustee, were to receive compensation for their services as fixed by mutual agreement of the partners; that contracts or purchases in excess of $50 were to *139 be made only upon the consultation and approval of all partners; that all contracts were to be made in the name of Whittenberg Construction Company, and that the partnership gains, profits and losses should be divided among the partners in accordance with their various interests, "but such division shall be made only by mutual consent of all the partners." The agreement also provided that petitioner's wife, as trustee for the three minor children, should manage their respective interests in the partnership and represent their interests in all transactions of the partnership. The agreement also provided that partnership books were to be kept, reflecting all partnership transactions, and were to be accessible at all times to each partner. Partnership funds were to be deposited in banks and were subject to withdrawal by any two of the parties to the agreement, except for payroll and incidental amounts. The partnership was terminable by joint consent of the parties to the agreement, or by notice in writing from any one of them. Death, bankruptcy or insolvency, or total and permanent disability of Irion, petitioner, or any one of the three sons, also terminated the partnership. It is provided *140 in the agreement that upon termination of the partnership by notice, all equipment and fixed assets, including real estate, is to be appraised at $30,000, regardless of its actual value, unless such appraised value is changed by mutual agreement of the partners. The partner giving notice of termination is required to pay to each of the other partners, $10,000, each, for equipment and fixed assets, whereupon the partner giving notice would become the owner of those assets. In case of dissolution of the partnership due to death, insolvency, or permanent disability, the same provisions with respect to the appraised value of the equipment and fixed assets are to apply. The partnership agreement of January 3, 1941, contained sutstantially the same provisions as the prior agreement which had been executed by petitioner and Irion on January 3, 1939. As of January 1, 1941, the net worth of the Whittenberg Construction Company was $122,614.58, consisting of $37,296.88, fixed assets, and $85,317.70, net quick assets. Petitioner considered that the value of the one-third interests which he was conveying to his wife as trustee for his sons was $40,871.52, or $13,623.84, as the value of the one-ninth *141 interest for each child. Accordingly. he filed a gift tax return for 1941 reporting the gifts at the above value. After the execution of the new partnership agreement in January, 1941, five investment accounts were opened on the books of the Whittenberg Construction Company in the names of petitioner, Irion, and Kathleen Whittenberg, as trustee for each child, and the amount of the interest of each person was entered as $40,871.53 for petitioner, $40,871.53 for Irion, and $13,623.84 for the trustee for each child. Only petitioner and Irion had personal or drawing accounts. They continued to receive in 1941 the same salaries they had received in 1940; $5.200 for petitioner plus "entertainment" expense, and $3,900 for Irion plus the same type expense. During 1941, Kathleen Whittenberg did not perform any services for the company, and she was not paid or allowed any compensation. She did not participate in the business in any way, and she did not sign or countersign any checks for the company. After the above arrangements, the business was conducted in exactly the same way as before. Petitioner and Irion performed the same services. There was no dissolution of the business to mark *142 the end of one partnership and the start of another. During 1941, none of the earnings and profits of the business were distributed to the five individuals named as partners. It was the policy to leave the profits in the business. No payments of any kind were made to Kathleen Whittenberg, as trustee for the children. After the close of the year, the profits for 1941 were allocated on the books to each of the five investment accounts by credits of $96,091.57 to each account of petitioner and Irion, and of $32,030.53 to each of the three accounts in the name of petitioner's wife, as trustee. For the year 1941, Kathleen Whittenberg filed a fiduciary income tax return for each child, in which was reported a share of the profits of the partnership in approximately the same amount as the credits in each investment account on the company's books. In 1940, the Whittenberg Construction Company obtained contracts with the Federal Government to carry out construction work at Bowman Field, Louisville, Kentucky, at Covington, Kentucky, and at Fort Knox, Kentucky. None of these contracts was completed in 1940, and the work carried over into 1941. These contracts stood in the names of petitioner *143 and Irion, as partners, and the contracts were not changed in 1941, to show that a new partnership with the children as members thereof had been created. In 1941, negotiations were in progress to write a new contract for constructing a housing project at Camp Taylor, in which only the names of petitioner and Irion appeared as partners. However, Kathleen Whittenberg, as trustee for the children, was named as a partner in other contracts executed by the Whittenberg Construction Company in 1942. The contract for construction work at Fort Knox, Kentucky, for the construction of apartment buildings, was a joint venture in which three other companies participated with the Whittenberg Construction Company. The total estimated cost of the construction was around 12 million dollars. This contract was a fixed fee contract. Under a fixed fee contract, the contractor finances the costs of materials and labor and then submits his costs to the Government for reimbursement. The contracts for work at Bowman Field and Covington were lump sum contracts. Under such contracts, the Government makes periodic payments to the contractor, as the work progresses, which enables the contractor to pay his costs *144 and to carry on with lower borrowings from banks. Under a lump sum contract, the profit to the contractor depends upon his skill in financing the project, because the contract sets forth a fixed sum for the job, and if costs run too high, the contractor stands to realize less profit or none. Under a fixed fee contract, the contractor is paid a stated fee for his services and he is certain of realizing his fee above costs. There is less risk to the contractor in the matter of realizing his profit under the fixed fee type of contract. The capital required to carry out the construction of projects under contracts was, in the end, provided by the Government, which paid the costs at the end of a job or during its progress, depending upon the type of contract. Pending receipt of payments by the Government, the Construction Company borrowed from banks, and during 1941 at least $600,000 was borrowed. Four banks made loans to the company (usually on short term notes), one bank in Chicago and three banks in Louisville. The Construction Company owned certain equipment which it used in the work done, but the book value of such equipment as of January 1, 1941, was only $23.000, in round figures. *145 Although the books carried as a fixed asset the land upon which the company's building was located, the land was not owned by the company, but was owned by petitioner, as has been noted above. According to the books on January 1, 1941. fixed assets were as follows: Fixed Assets
Land [sic]
$ 2,502.50
Buildings
8,653.24
Equipment - Heavy
11,815.42
Light
2,288.80
Automotive
8,962.16
Office
1,482.76
Other Assets
1,592.00
Total
$37,296.88
As of January 1, 1941, the financial statement's showing of net worth of $122,614.58, reflected "quick assets" of $85,317.70. That amount represents the difference, on the books, between current assets of $1,175,621.66 and current liabilities of $1,090,303.96, as follows: Current Assets
Cash
$ 21,079.32
Accounts Receivable
1,154,542.34
Total
$1,175,621.66
Current Liabilities
Accounts Payable
$ 470,308.99
Notes Payable
602,000.00
Accrued Expenses
17,994.97
Total
$1,090,303.96
The above statement of current assets and liabilities reflects the amounts involved under contracts, the costs being repaid to the Construction Company by the Government. It does not reflect fees, or profit, as such, earned under *146 the contracts. In its income tax return for 1941. Whittenberg Construction Company reported gross income from all sources in the amount of $326,421.25, as follows: Income
Fixed Fees (Supervision)
$133,170.51
Lump Sum Contracts - Net
183,144.81
Miscellaneous Income
10,105.93
(Rental of equipment, esti-
mating fees, sale of scrap
material)
Total
$326,421.25 The company reported in its 1941 return, net income, after deducting expenses of $36,682.38, in the sum of $289,738.87. The expenses were for advertising, auto expenses, donations, dues and subscriptions, insurance, interest, legal and auditing fees, office, office salaries, water, taxes and licenses, telephone, travel, gas and electricity, equipment, entertainment, and depreciation. For the year 1942, the profit of the Whittenberg Construction Company was $432,659.72, as follows: Profit from Lump Sum and
Fixed Fee Contracts
$433,921.21
Income from other sources
7,936.29
$441,857.50
Less charges for depreciation
on equipment used
9,197.78
Net
$432,659.72
The net profit, after expenses of the type set forth above amounting to $31,619.85 and before deducting partner's salaries, was $401,039.87. *147 The income of the Whittenberg Construction Company was in the nature of fees for services in performing contracts under which all costs were ultimately paid by the Government, so that the contracts were, in the last analysis, financed by the Government. The services for which the fees were received were personal services rendered by petitioner and Irion. Their services consisted of submitting estimates, negotiating contracts and obtaining loans, purchasing material and labor, and supervising work, directly or through their assistants. The services of petitioner in the business were the same in 1941 as in the prior year. He presented bids, negotiated contracts, purchased materials, obtained bank loans, and made the final decisions on what was to be done after consulting Irion. Irion's services were the same in 1941 as in the prior year. His chief work was the preparation of estimates for construction work. Kathleen Whittenberg has no technical or general knowledge of the business. Petitioner exercised the primary powers of management in the business. He and Irion were the managing partners, under the partnership agreement. The Whittenberg Construction Company regularly employs about *148 fifteen persons in its office. The laborers employed vary from 100 to 2,000. depending on the size of the project. The company employs a general superintendent of construction work, and assistants for him. The notice of deficiency in this proceeding is dated June 2, 1943. In determining the deficiency, respondent recomputed the partnership income, so that after adjustments it was $308,372.10, and respondent held that petitioner's distributive share of the partnership income was $204,714.73, instead of $98,746.29, as reported by petitioner. Respondent determined that petitioner was taxable on such income under section 22 (a). No distributions of cash were made to Kathleen Whittenberg, as trustee for the children, by the Whittenberg Construction Company until on or about June 18, 1943, when $15,000 was paid to her. On that date, for the first time, she opened a bank account for the trusts in her name, as trustee for the children, and the above sum was deposited in the account. As of December 31, 1943, the credit balance in the account was $11,607.90. In November of 1943, $3,375 was withdrawn to purchase some bonds for the trusts. Other withdrawals were for bank service charges and *149 bank tax. Petitioner made the decision as to the bonds to be purchased. During 1942 and 1943, charges were made against each of the five investment accounts for income taxes, for the purchase of stock in Evans-Inman Lumber Company, and for the purchase of stock in Whittenberg Corporation, a corporation organized by petitioner, Irion, and George W. Hillard in June of 1942. Whittenberg Corporation was organized in 1942 for the purpose of carrying on the business which had been carried on by the partnership. Its authorized capital was 3,000 shares, par value $100 per share. On June 15, 1942, 1,989 shares of stock were issued in the names of petitioner, Irion, and Kathleen Whittenberg, as trustee for each child, in the same proportion as their respective interests in the partnership; 663 shares, each, in the name of petitioner and Irion, and 221 shares, each, in the name of the trustee for each child. The above stock was paid for by five checks of Whittenberg Construction Company, made payable to the partners and endorsed by them to be credited to the account of the corporation. The Whittenberg Construction Company completed its last construction contract in March, 1943. It still owns *150 property, most of which it rents to the corporation. No dividends have been paid by the corporation. Mrs. Whittenberg keeps the certificates representing stock in the corporation in a safe deposit box which stands in her name alone. OPINION: The sole question under this issue is whether or not the three minor children of petitioner, represented by their mother as trustee, can be recognized as members of the partnership conducting the business of Whittenberg Construction Company for income tax purposes, so as to make them, instead of petitioner, taxable on one-third of the 1941 income of the business. Respondent contends that the alleged new partnership, to which the minor children are said to have contributed property under petitioner's assignments to them of interests in the business, was not a bona fide partnership; that in reality the old partnership consisting of only petitioner and Irion continued in existence in the taxable year; and that, consequently, petitioner's interest in the partnership was a two-thirds interest in the taxable year and he is taxable on two-thirds of the income. Petitioner contends that petitioner's arrangement should be recognized as constituting *151 the children as members of the partnership. Upon due consideration of the evidence in this proceeding, it is concluded that the formal steps taken in January of 1941 can not, for income tax purposes, be recognized as achieving the result of relieving petitioner from income tax on one-third of the partnership income which he now contends was owned by his children through their trustee. This conclusion is made upon two grounds: First, that the income of the business was earned through the personal efforts of petitioner and his partner, Irion, so that the steps taken were in the nature of anticipatory arrangements to attribute income to other persons than the earners. Second, that the terms of the 1941 partnership agreement were such that the alleged donees, the children, did not receive present and complete interests in the business under which full dominion over income produced by such interests was obtained. Petitioner had been a general contractor for about 12 years. Prior to 1941, the business which he conducted with Irion became exclusively a contract business with the Federal Government. In 1940 contracts had been executed in which the contractors, as partners, were petitioner *152 and Irion and they were personally obligated to carry out the contracts. During 1941, petitioner and Irion alone were the parties to those contracts. Obviously, neither the wife nor the children of petitioner rendered any services under the contracts so as to earn any of the fees paid upon completion thereof. From the evidence before us, the only conclusion which can be made reasonably is that the income of the Construction Company was derived from the personal efforts of petitioner and Irion. Petitioner has not shown that all or part of the income of the business was derived from the employment of capital. When the earnings of a business are due mainly to the personal efforts of a taxpayer, a family partnership can not be recognized so as to distribute the tax on the income over the members of the family, some of whom did not earn the income. See Earp v. Jones, 131 Fed. (2d) 292; certiorari denied, 318 U.S. 764; Mead v. Commissioner, 131 Fed. (2d) 323; certiorari denied, 318 U.S. 777; Schroder v. Commissioner, 134 Fed. (2d) 346; and *153 Montgomery, et ux, v. Thomas, (D.C., N.D.Texas, Dallas Div., March 14, 1944, unreported in Fed. Supp.), Prentice-Hall Federal Tax Service, 1944, par. 62,509, where similar facts were presented. As we said in M. M. Argo, 3 T.C. 1120. "In this situation, if the petitioner would escape tax on the distributive shares of his partners, we think he should have shown that his activities and services were not the main factors in the production of the income of the company." It has been found as a fact that the income of the Construction Company was in the nature of fees for services in executing contracts, and that such services were rendered by petitioner and Irion. This finding has been made from such evidence as we have which does not include evidence to show that income was predominantly produced by capital owned by the business and employed in the carrying out of the Government contracts. In order to give explanation of how petitioner arrived at the net worth of the business in 1941, there has been set forth in the findings of fact excerpts from the financial statement of the company as of January 1, 1941, but the record does not in any respect show *154 that accumulated capital, in whole or in part, of the company, other than the small amount of fixed assets comprising equipment, was required or used to carry on the work under contracts. For example, there is no accumulated earnings account in evidence. It is assumed that the company had accumulated earnings but the amount thereof is not known. The "current assets" shown in the financial statement appear to represent the contract amounts of the jobs under construction, which amounts were to be paid in gross or as net fees, or both, depending on whether the contract was a fixed fee or lump sum contract, by the Government. The record shows that $600,000 was borrowed from banks and that under the contracts payments by the Government, in some instances, were made as the work progressed. The contracts appear to have been financed, in the end, by the Government. We can not and do not find as a fact that the Construction Company employed $85,317.70, more or less, of its own capital in the contracts in progress. All that the record shows, clearly, is that about $23,000 of equipment, owned by the company, was used in the work under contracts during 1941. Such amount may have increased during *155 the year, but not to any great extent. The net earnings from fees during 1941 were $326,421. Under such facts, the comparatively small amount of capital known to have been used in earning the income can not alter our conclusion that the income in question was derived chiefly from personal services such as have been described in the findings of fact. In the Schroder case, supra, the court pointed out that "though the business had some physical assets, its earnings were mainly, indeed, almost entirely, due to the personal activities and abilities of petitioner, a mechanical and electrical engineer, and the business was essentially his." Here, we do not know whether or not petitioner was an engineer. The skill of a construction contractor may require the training of an engineer. No doubt, engineers were employed in the work that was being done. The contracts involved in this case were not presented in evidence. But we must assume that the contractors, petitioner and Irion, had duties imposed upon them under the contracts, which primarily required the application of personal knowledge and skill. Certainly, the business was essentially theirs. With respect to the interests in *156 the partnership which petitioner attempted to transfer, in trust, to his minor children, the following is noted: The owner of an interest in a partnership usually has the clear right to receive a share of earnings and to dispose of his interest. Under the terms of the new partnership agreement, no part of the earnings of the business could be divided except "by mutual consent of all partners." Petitioner testified that divided meant distributed. The situation was such, therefore, that the earnings could not be distributed to the children except by the consent of petitioner. Consequently, petitioner retained control over the earnings of his two-thirds share of the business, and could determine whether such share of earnings was to be left in the business, used in risky or safe investments, or distributed. Also, no partner could assign his interest except by mutual consent of the partners. There were no distributions of earnings in 1941. In 1942, there were none except in the form of charges to the investment accounts, when stocks were purchased by the partnership in the names of the partners. A very large part of earnings, about $199,198, was transferred over to a new corporation in *157 1942, in exchange for stock. Thus, petitioner did not demonstrate any intent to divest himself of the control over the entire two-thirds portion of the business' earnings, nor did he transfer to the trusts, to establish any estate therein, the shares of earnings which he here attributes to the ownership of the children. It was not until after the present controversy took form that, in 1943, a small cash distribution was made to the trustee. The provisions for terminating the partnership, paragraph 12, were such that petitioner could, if he wished, reacquire the one-third interest he purportedly gave his children for $10,000, regardless of the value of fixed assets at the time. The trustee of the children's interests could not, however, obtain $10,000 in property or cash merely by giving notice of her desire to terminate the partnership. If she gave such notice, she had to pay $10,000 to Iron and $10,000 to petitioner, and take over all of the assets. The terms of paragraph 12 are such that it was, for all practical purposes, wholly within the control of petitioner whether or not the children could, during his lifetime, receive a cash payment for their interest in the business under *158 their supposed ownership of a one-third interest, therein, depending upon his willingness to purchase their interest. At any rate, the provisions for terminating the partnership, under the agreement are such as to raise serious doubt about the giving of a free and uncontrolled right to the children or their trustees to withdraw at will property or the cash equivalent from the business, and we consider the doubt as a factor weighing against petitioner's contentions. In conclusion, there is a great doubt, from reading the terms of the new partnership agreement, whether the children, through their trustee, received a third interest in the business free from the dominion and control of petitioner. In such circumstances, petitioner is taxable upon the share of the income allocable to the one-third interest he allegedly transferred in trust. Francis E. Tower, 3 T.C. 396; O. William Lowry, 3 T.C. 730. Under this issue, for the reasons stated, respondent's determination is sustained. Decision will be entered for the respondent. Footnotes
*. Book cost less depreciation.↩
1. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1);↩